**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHETTY SEVUGAN, individually and on behalf of all others similarly situated, | )<br>)<br>) |
| Plaintiff, | ) Case No. 1:17-cv-6569 |
| v. | ) Judge Virginia M. Kendall |
| DIRECT ENERGY SERVICES, LLC, a Delaware corporation, | )<br>) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Chetty Sevugan, individually and on behalf of all others similarly situated, brings this action against Defendant Direct Energy Services, LLC ("Direct Energy") alleging a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act[1] ("ICFA"), breach of contract, breach of implied covenant of good faith and fair dealing, and unjust enrichment. (Dkt. No. 9.) Sevugan seeks punitive damages, attorney's fees, and injunctive relief. (*Id.*) Direct Energy filed a Motion to Dismiss all of Sevugan's claims. (Dkt. No. 21.) For the following reasons, the Motion to Dismiss is granted.

## BACKGROUND

The following facts are based on the allegations in the Complaint as well as the partial 2011 Direct Energy Electricity Supply Contract and the 2011 Direct Energy Residential Uniform Disclosure Statement for Illinois attached to the Complaint. (Dkt. No. 9, Ex. 1-2); *see also Tierney v. Vahle*, 304 F.3d 734, 738-39 (7th Cir. 2002) (documents attached to the complaint "indisputably becomes a part of it for all purposes") (citing Fed. R. Civ. P. 10(c)). The Court accepts all well-pleaded facts in the Complaint as true for purposes of the Motion to Dismiss and

---
[1] 815 ILCS 505/1, *et seq.*

draws all reasonable inferences in favor of Sevugan. *See Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010). The Court also considers the complete version of the 2011 Direct Energy Supply Contract attached to Direct Energy's Motion to Dismiss. (Dkt. No. 21-3). Generally, matters outside the pleadings may not be considered on a motion to dismiss. *See* Fed. R. Civ. P. 12(b). However, the Court can examine concededly authentic documents attached to a party's motion to dismiss if the documents are referred to in the plaintiff's complaint and are central to his claim. *See Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 718 (7th Cir. 2003); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 432 (7th Cir. 1993). The 2011 contract is referred to in the Complaint and central to Sevugan's claim and the majority of it is already incorporated into the Complaint by Sevugan.[2]

Prior to 1997, only local public utility companies were permitted to sell and distribute electricity in Illinois. (Dkt. No. 9 at ¶ 9). In 1997, Illinois deregulated the market for electricity supply, allowing independent, privately-operated alternative retail electric suppliers ("ARES") to supply electricity without having to disclose the rates they charged or their method for setting those rates to the Illinois Commerce Commission.[3] (*Id.* at ¶¶ 9-10). The purpose of the deregulation was to increase competition among suppliers thereby reducing wholesale

---

[2] Direct Energy also attached to its Motion to Dismiss a certified transcript of an August 5, 2011 enrollment call between Sevugan and a Direct Energy representative. (Dkt. No. 21-2). However, the Court finds that the call is not sufficiently referenced in the Complaint to warrant consideration of this transcript at the motion to dismiss stage. Sevugan alleges simply that he was "solicited" by a Direct Energy representative but it is not clear from the face of the Complaint that the "solicitation" refers to the August 5, 2011 call. *C.f. Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 647 (N.D. Ill. 2015) (court considered call transcripts attached to defendant's motion to dismiss where complaint alleged misstatements were made during analyst calls and included excerpts from those calls); *Rubinstein v. Gonzalez*, No. 14-CV-9465, 2016 WL 1213931, at *3 (N.D. Ill. Mar. 29, 2016) (court considered call transcript attached to motion to dismiss where complaint alleged misstatements were made during telephonic investor conference and included excerpts of the investor conference call). In fact, the transcript is of a call *from* Sevugan to Direct Energy after he purportedly received a letter from Direct Energy.

[3] Sevugan refers to these entities as energy service companies ("ESCOs"). However, the Illinois' Electric Service Customer Choice and Rate Relief Law of 1997 discussed in the Complaint applies specifically to alternative retail electric suppliers, or ARES, as defined in the Act. 220 ILCS 5/16-101. Therefore, the Court will use the term ARES.

purchasing costs and, in turn, retail residential rates. (*Id.* at ¶ 9). When a customer switches to an ARES, the ARES supplies the electricity but the local utility continues to deliver the electricity and to bill the customer for both the supply and delivery costs. (*Id.* at ¶ 11). For an ARES customer, the utility calculates the supply cost as the number of kilowatt hours used multiplied by the supply rate charged by the ARES, instead of the regulated rate charged by the utility. (*Id.* at ¶¶ 11-12).

Direct Energy is an ARES that supplies electricity to Illinois consumers. (*Id.* at ¶ 13). Sevugan alleges that Direct Energy exploited the deregulation of the Illinois electricity supply market by falsely promising to charge variable rates based on market-related factors in order to lure consumers from local utilities and instead charging rates that are not based on market-related factors and are substantially higher than those charged by the utilities. (*See, e.g., id.* at ¶¶ 2-3, 13-14).

Sevugan switched electricity suppliers and entered into a contract with Direct Energy in or around August 2011. (*Id.* at ¶ 17, Ex. A). Sevugan alleges that a Direct Energy representative "solicited" him to switch from his former supplier, utility company Commonwealth Edison ("ComEd"), by offering him a teaser rate lower than its regular rates and promising he would save money if he switched to Direct Energy. (*Id.* at ¶¶ 15-16). Sevugan entered into a contractual relationship with Direct Energy governed by the 2011 Energy Supply Contract, which provided in relevant part:

> **1. Terms of Service.** The essential terms of your electric generation service are as follows:
>
> **Initial Term.** "The Initial Term of your service is 12 monthly billing cycles. ("Initial Term").
>
> **Electric Generation Service Price per kWh *During* Initial Term.** During your Initial Term you will pay Direct Energy a fixed price of $.0689 per kWh. This

> price includes your electric generation service and transmission charges, and *excludes* taxes and other utility fees and charges. . . .
>
> **Electric Generation Service Price per kWh *After* Initial Term.** Your service will automatically continue on a month-to-month basis, and you will pay a variable price per kWh. This price may be higher or lower each monthly bill cycle. There is no early cancellation fee while taking service on a month-to-month basis. See Section 5 for details. . . .

(*Id.* at ¶¶ 17-18, Ex. A. at ¶ 1 (emphasis in original)). Sevugan was initially placed on a 12-month fixed rate plan and "subsequently switched to a variable rate plan." (*Id.* at ¶¶ 18-19).

Section 5 of the Electric Supply Contract provided the following with regard to the variable rate to be charged after the Initial Term:

> **5. <u>Renewal; Notice of a Change to this Agreement</u>.** Upon completion of the Initial Term, this Agreement will automatically renew on a month-to-month basis at a variable price per kWh with no early cancellation fee. ***Direct Energy will charge you at a variable price per kWh based upon generally prevailing market prices for electricity in the PJM market at the Electric Utility load zone for the applicable period, plus an adder, determined solely by Direct Energy in its discretion.*** . . . You may obtain next month's variable price by calling Direct Energy using the contact information set forth in Section 15 below. Pricing is available on the 20th day (or following business day) of the previous month.

(*Id.* at Ex. A ¶ 5 (emphasis added)). The 2011 Residential Uniform Disclosure Statement for Illinois stated the same:

> After the Initial Term, your service will automatically continue on a month-to-month basis, and you will pay a variable price per kWh. Direct Energy will charge you at a variable price per kWh ***based upon generally prevailing market prices for electricity . . . plus an adder, determined solely by Direct Energy in its discretion***.

(*Id.* at Ex. B (emphasis added)).

Sevugan assumed based on these representations that Direct Energy would charge rates "based on market-related factors" and that such rates would reflect changes in wholesale market prices for electricity and be commensurate with the rates offered by the local utility and other ARES. (*Id.* at ¶¶ 21-22). Direct Energy rates did not reflect wholesale market prices or rates

4

charged by other suppliers. (*Id.* at ¶ 23). Rather, Direct Energy charged Sevugan variable rates as high as 145% of ComEd rates for 2012, 120% for 2013, 150% for 2014, 240% or 2015, and 350% for 2016. (*Id.* at ¶ 24). Sevugan contends that rates charged by utilities like ComEd are "an accurate measure of what market-based rates should be" because utilities purchase electricity from the Illinois wholesale electricity market at the same prices per kilowatt that other suppliers, including Direct Energy, can purchase electricity for supply to consumers. (*Id.* at ¶¶ 25-27). Accordingly, Sevugan argues that Direct Energy rates could not have been based on market-related factors because they were substantially higher than ComEd's and other utilities' and ARES' rates. (*Id.* at ¶¶ 28-29-27).

Sevugan alleges that Direct Energy's statements and omissions to consumers with respect to the rates it will charge are materially misleading because it does not charge rates based on market-related factors and fails to disclose that its rates are substantially higher than rates based on market-related factors, knowing that the only reason a reasonable consumer would switch from a local utility to Direct Energy is for the potential to pay market-based rates. (*Id.* at ¶¶ 32, 34-35). Sevugan claims that neither he nor any reasonable consumer would have enrolled in Direct Energy's plan had he known the rates would be higher than those charged by the local utilities and, therefore, suffered injuries caused by Direct Energy's misrepresentations and omissions by paying the higher rates. (*Id.* at ¶¶ 32, 34-35).

Sevugan alleges state law claims for violation of ICFA, breach of contract, breach of implied covenant of good faith and fair dealing, and unjust enrichment. Direct Energy seeks to dismiss Sevugan's claims pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). (Dkt. No. 21).

## LEGAL STANDARD

In order for a claim to survive a 12(b)(6) motion to dismiss, the complaint must contain sufficient factual allegations to plausibly suggest that the plaintiff is entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *McCauley v. City of Chicago*, 671 F.3d 611, 615 (7th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). Facial plausibility requires factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Determining plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *McCauley*, 671 F.3d at 616 (quoting *Iqbal*, 556 U.S. at 679). In evaluating a motion to dismiss brought pursuant to Rule 12(b)(6), the Court must accept as true all well-pleaded allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 903 (7th Cir. 2011).

Rule 9(b) requires a party alleging fraud to "state with particularly the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This heightened pleading requirement was intended to protect against the "great harm to the reputation of a business firm or other enterprise a fraud claim can do." *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir.2007). Thus, pursuant to Rule 9(b), a plaintiff must "describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th 2009)).

**DISCUSSION**

I.  **The Illinois Consumer Fraud and Deceptive Practices Act**

Sevugan's ICFA claim alleges that Direct Energy "knowingly and willfully misrepresented to [him] and the class that [its] rates are based on market-related factors and reflective of wholesale electricity costs in the market when its rates are not, in fact, based on market-related factors" and "failed to inform consumers of the material fact that [its] rates are substantially higher than those otherwise available in the market" with the intent that consumers rely on this deception, causing him and the class "to pay substantially higher rates than those otherwise available in the market." (Dkt. No. 9 at ¶¶ 47-49). Direct Energy seeks to dismiss Sevugan's ICFA claim for failure to bring the claim within the statute of limitations and for failure to state a claim pursuant to Rule 12(b)(6) and to meet the heightened pleading standards required by Rule 9(b).

   A.  **Sevugan's ICFA claim is not time-barred.**

Direct Energy argues first that Sevugan's ICFA claim is time-barred. "Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009); *see also United States v. N. Tr. Co.*, 372 F.3d 886, 888 (7th Cir. 2004) (dismissing a complaint as time-barred under Rule 12(b)(6) is "irregular"). Such dismissal is appropriate only where "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense, such as when a complaint plainly reveals that an action is untimely under the governing statute of limitations." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005); *see also Cannon v. Newport*, 850 F.3d 303, 306 (7th Cir.), *cert. denied*, 138 S. Ct. 320 (2017) ("[W]hen a complaint

reveals that the action is untimely, the court can dismiss it."). "In other words, the plaintiff must affirmatively plead himself out of court." *Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 614 (7th Cir. 2014).

ICFA claims must be brought "within 3 years after the cause of action accrued." 815 ILCS 505/10a(e); *see also*, *e.g.*, *Addison Automatics, Inc. v. RTC Grp., Inc.*, 2013 WL 3771423, at *6 (N.D. Ill. July 16, 2013). Under Illinois law, "[c]laims accrue, commencing the limitations period, when 'the party seeking relief knows or reasonably should know of an injury and that it was wrongfully caused.'" *Pendleton v. Pendleton*, 50 F. Appx 770, 773 (7th Cir. 2002) (quoting *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 192 (Ill. 2002)). The term "wrongfully caused" does not mean the plaintiff must have knowledge of actionable conduct before the statute of limitations is triggered; rather, it requires only that the plaintiff have "sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved.'" *In re marchFIRST Inc.*, 589 F.3d 901, 904 (7th Cir. 2009) (quoting *Knox Coll. v. Celotex Corp.,* 430 N.E.2d 976, 980-81 (Ill. 1981)).

Sevugan's alleged injury for purposes of the ICFA claim is that he paid Direct Energy variable rates that were "substantially higher" than rates otherwise available in the market. (Dkt. No. 9 at ¶ 49). The Complaint does not specifically allege when Sevugan began paying the higher variable rates or when he knew these rates were wrongfully caused. It alleges only that Sevugan switched to Direct Energy "in or around 2011," "was initially placed on an introductory fixed rate plan" and "subsequently switched to a variable rate plan." (*Id.* at ¶¶ 17-19). The Electric Supply Contract suggests Sevugan *could have* begun paying a variable rate as early as August 2012, as it provided that Direct Energy would charge Sevugan variable rates after the 12-month, fixed-rate Initial Term expired. (*Id.* at Ex. A, ¶ 1). The fact that the Complaint points to

discrepancies in the rates charged by Direct Energy and ComEd starting in 2012 supports this inference. (*Id.* at ¶ 24 ("The variable rates that Direct Energy charged *Plaintiff* . . . evidence that Direct Energy rates were as high as 145% of Com.Ed. rates for 2012 . . ." (emphasis added)). Regardless, Sevugan's claim did not accrue when the variable rate began but when he knew enough to be put on inquiry that he was paying higher-than-market rates because he had been deceived. Nothing in the Complaint sheds light on when or how Sevugan learned that the variable rates were higher than others available in the market, that the variable rates were not commensurate with wholesale market changes, or any other information that could possibly alert him to wrongful conduct of the type he alleges on the part of Direct Energy. Therefore, the Complaint does not "plainly reveal" that Sevugan's ICFA claim is untimely, and the Court declines to dismiss it as time-barred at this stage.

> **B.**     **Sevugan fails to state an ICFA claim pursuant to Rule 12(b)(6) and the heightened pleading standards of Rule 9(b).**

To state a claim under ICFA, a plaintiff must allege: "(1) a deceptive act or practice by the defendant; (2) the defendant intended that the plaintiff rely on the deception; (3) the deception occurred in the course of conduct involving trade or commerce; (4) the plaintiff suffered actual damage; and (5) the damage was proximately caused by the deception." *Geschke v. Air Force Ass'n*, 425 F. 3d 337, 345 (7th Cir. 2005) (citing *Oliveira v. Amoco Oil. Co.*, 776 N.E.2d 151, 160, (Ill. 2002)). This framework applies to unfair and deceptive acts and practices. *Philadelphia Indemnity Ins. Co. v. Chicago Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014) (citations omitted). Direct Energy argues Sevugan fails to sufficiently allege that it engaged in a deceptive practice or that Sevugan was actually deceived by its statements. (Dkt. No. 21 at 9-10).

Like common law fraud, ICFA claims of deceptive acts or practices invoke the heightened pleading standard of Rule 9(b). *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011). Thus, plaintiffs alleging ICFA claims must state with particularity and specificity the circumstances surrounding the allegedly fraudulent conduct. *Id.* In other words, "a plaintiff ordinarily must describe the 'who, what, when, where, and how' of the fraud." *Id.* at 441–42 (citation omitted).

Sevugan initially offered two theories of deceptive acts and practices—the "what" of his claim— in the Complaint. First, the Complaint alleges that Direct Energy misrepresented that it would charge rates "based on market-related factors and reflective of wholesale electricity costs in the market when its rates are not, in fact, based on market-related factors." (Dkt. No. 9 at ¶ 47.) Second, the Complaint alleges that Direct Energy acted deceptively by "fail[ing] to inform consumers of the material fact that Direct Energy's rates are substantially higher than those otherwise available in the market." (*Id.* at ¶ 48.) However, Sevugan abandons the latter omissions theory in his Response to Direct Energy's Motion to Dismiss.[4] The Court therefore focuses only on whether the alleged misrepresentations constitute deceptive acts and practices under ICFA.

"[A] statement is deceptive if it creates a likelihood of deception or has the capacity to deceive." *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001) (citing *People ex rel. Hartigan v. Knecht Servs., Inc.*, 575 N.E.2d 1378, 1387 (Ill. App. Ct. 1991)). The allegations in the Complaint offer little insight into what allegedly deceptive statements Direct

---

[4] Direct Energy argues in its Motion to Dismiss that Sevugan's Complaint failed to state a claim for consumer fraud based on an omission because the Electric Supply Contract itself detailed how Sevugan could check the variable rates he would be charged. (*See* Dkt. No. 21 at 8). In his Response, Sevugan did not address this argument or otherwise discuss the omissions alleged in the Complaint in any way. *See Lekas v. Briley*, 405 F.3d 602, 614 (7th Cir. 2005) (dismissing claim as abandoned where plaintiff "did not present legal arguments or cite relevant authority to substantiate that claim in responding to defendants' motion to dismiss"). Rather, Sevugan asserted that he "bases his ICFA claim on Defendant having promised to set its rates one way and doing so another." (Dkt. No. 28, at 6.)

Energy actually made to Sevugan or how those statements misled him. Plaintiff offers only general allegations that Direct Energy "lur[es] consumers into switching energy suppliers with false promises that it offers market based variable rates," Direct Energy "lures consumers to switch from their local utility companies or other energy suppliers, promising that it will offer market based variable rates for electricity," "Direct Energy's scheme falsely promises energy rates based on market-related factors," and "Direct Energy . . . misrepresented to Plaintiff and the Class that Direct Energy's rates are based on market-related factors and reflective of wholesale electricity costs." (Dkt. No. 9 at ¶¶ 2, 14, 47.) The Complaint is entirely void of any specifics related to these alleged promises, for example, what was said, when it was said, who said it, or how the representation was made. *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008) (internal quotation marks omitted) ("[T]he district court properly dismissed the plaintiffs' fraud claims for failure to state with particularity who made the fraudulent statement, when the fraudulent statement was made, and how the fraudulent statement was made.").[5]

In his Response to Direct Energy's Motion to Dismiss, Sevugan argues that the language in the Electric Supply Contract—that the rates are based "upon generally prevailing market prices for electricity . . . plus an adder"—is the deceptive statement giving rise to his ICFA claim. (Dkt. No. 28 at 7). However, Sevugan may not base his ICFA claim on the parties' contract. Sevugan must allege "unfair and deceptive conduct distinct from the alleged breach of a contractual promise" in order to state a claim under ICFA. *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 400 (7th Cir. 2011); *see also Avery v. State Farm Mutual Auto. Ins. Co.*, 835

---

[5] The Complaint alleges that in August 2011 a Direct Energy representative promised him "he would save money if he switched to Direct Energy." (*Id.* at ¶ 16). However, Sevugan's ICFA claim is not based on alleged misrepresentations that he would "save money" but that Direct Energy would charge rates "based on market-related factors."

11

N.E. 2d 801, 844 (2005) ("A breach of contractual promise, without more, is not actionable under the Consumer Fraud Act.").

Sevugan also relies on *Zahn v. N. Am. Power & Gas, LLC*, to argue that his ICFA claim is sufficiently plead. 847 F.3d 875 (7th Cir. 2017). But *Zahn* is easily distinguished. In *Zahn*, the plaintiff alleged that she entered into a contract with the defendant service provider after it offered her a temporary initial rate for new customers but that she never in fact received the initial rate as promised. *Id.* at 877-78 ("[The plaintiff] alleged that the teaser rate [the defendant] offered her was $.0499 per kilowatt hour and that she never received that initial rate but instead was charged $.0599 per kilowatt hour on her initial bill."). The Seventh Circuit held that offering a teaser rate that was never in fact received "could constitute a breach of contract or a deceptive business practice." *Id.* at 878. Here, however, Sevugan admits that he received the initial rate as promised. (Dkt. No. 9 at ¶ 18 ("Plaintiff was initially placed on an introductory fixed rate plan for electricity.")).

Finally, "[a] plaintiff may allege that conduct is unfair under ICFA without alleging that the conduct is deceptive." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010) (citation omitted). In his Response to the Motion to Dismiss, Sevugan argues for the first time that Direct Energy's conduct is not only deceptive but also "unfair." (Dkt. No. 28 at 8). "While charging an unconscionably high price generally is insufficient to establish a claim for unfairness, whether a practice is unfair depends on a case-by-case analysis." *Siegel*, 612 F.3d at 935. "Because neither fraud nor mistake is an element of unfair conduct under Illinois' Consumer Fraud Act, a cause of action for unfair practices under the Consumer Fraud Act need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b)." *Windy City Metal*, 536 F.3d at 670. Therefore, the complaint need only "provide a short and plain statement of the

claim that shows, through its allegations, that recovery is plausible rather than merely speculative." *Id.* (citation omitted).

Conduct is unfair if it "(1) violate[s] public policy; (2) [is] so oppressive that the consumer has little choice but to submit; and (3) cause[s] consumers substantial injury." *Siegel*, 612 F.3d at 935 (citing *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002)). Conduct need not satisfy all three criteria to permit a finding of unfairness. *Id.* The injury to consumers must: "(1) be substantial; (2) not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) be an injury that consumers themselves could not reasonably have avoided." *Id.*; *see also Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 834 (7th Cir. 2014).

Sevugan's Complaint contains no explicit allegations of unfairness. The Complaint focuses only on alleged deceptive practices and clearly states: "This action seeks to redress the *deceptive* pricing practices of Direct Energy that have caused thousands of Illinois consumers to pay considerably more for their electricity than they should otherwise have paid." (Dkt. No. 9, at ¶ 1 (emphasis added)). The Complaint also alleges that Direct Energy made "false promises" and that "Direct Energy's representations are *deceptive*." (*Id.* at ¶¶ 2–3 (emphasis added)). Thus, in his Response to the Motion to Dismiss, Sevugan essentially contends that his allegations of deception simultaneously state a claim for unfair conduct in the alternative. But allowing Plaintiff's allegations of deceptive conduct to serve as the basis for a claim of unfair conduct would render the heightened pleading standard of Rule 9(b) pointless. *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014) ("Simply adding language of 'unfairness' instead of 'misrepresentation' does not alter the fact that [plaintiff's] allegations are entirely grounded in fraud under the ICFA.").

Even if Plaintiff had alleged unfair conduct, his argument would fail because his contract with Direct Energy gave him an explicit alternative: he could find out the variable rate by calling and could terminate the contract at any time with no cancellation fee. (Dkt. No. 9 at Ex. A, ¶ 1.) Because Sevugan had alternatives and could have reasonably avoided paying the variable rates, he fails to allege unfair conduct. *See Fogt v. 1-800-Pack-Rat, LLC*, 74 N.E.3d 186, 199 (Ill. App. Ct. 2017) ("To be oppressive, the conduct must leave the consumer with little alternative but to submit."); *see also, e.g., Saunders v. Michigan Ave. Nat. Bank*, 662 N.E.2d 602, 609 (Ill. 1996) (dismissing ICFA claim under 12(b)(6) finding "a total absence of the type of oppressiveness and lack of meaningful choice necessary to establish unfairness").

The Court dismisses the ICFA claim (Count I) without prejudice.

## II. Breach of Contract

"Under Illinois law, a plaintiff looking to state a colorable breach of contract claim must allege four elements: '(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.'" *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)). Not surprisingly, "a breach of contract claim requires an identifiable breach of a contract term." *Navar v. Tribler, Orpett & Meyer, P.C.*, 2015 IL App (1st) 142641-U, at *57 (Ill. App. Ct. 2015).

Here, the Complaint alleges that Sevugan entered into a contract with Direct Energy, pursuant to which Sevugan paid for electricity provided by Direct Energy. (Dkt. No. 9 at ¶ 54). The Complaint identifies the contract term Direct Energy allegedly breached as the term stating that Direct Energy would charge Plaintiff "at a variable price per kWh ***based upon generally prevailing market prices*** for electricity in the PJM market at the Electric Utility load zone for the

14

applicable period, ***plus an adder, determined solely by Direct Energy in its discretion***." (*Id.* at ¶ 19, Ex. A ¶ 5 (emphasis added)). In his Response to the Motion to Dismiss, Sevugan claims the Complaint alleges that Direct Energy breached this term "by charging him at a rate for electricity that was not based on these factors." (Dkt. No. 28 at 9). But that is incorrect. The Complaint alleges only that Direct Energy breached this term by charging "variable rates for electricity that were ***not based on market-related factors***." (Dkt. No. 9 at ¶ 57 (emphasis added)). The phrase "market-related factors" appears nowhere in the parties' contract. (*Id.* at Ex. A, ¶ 5).

Additionally, the Complaint does not allege facts sufficient to show that Direct Energy plausibly breached its contractual duty to calculate the variable rates "based upon generally prevailing market prices for electricity . . . plus an adder, determined solely by Direct Energy in its discretion." The only facts alleged in the Complaint with regard to the alleged breach are that the rates charged "were not commensurate with rates otherwise available in the market or with changes in wholesale rates" and were higher than rates charged by ComEd. As an initial matter, Sevugan's claim that rates charged by utilities are "an accurate reflection of rates that are based on market factors" is undermined by other statements in the Complaint alleging Illinois deregulated the electricity supply market because utilities were *not* providing market-based rates. Anyway, it does not matter because as stated above, the contract does not require Direct Energy to charge rates tied only to rates otherwise available or to wholesale rates or to charge rates lower than those charged by ComEd. The contract allowed Direct Energy to base its rate on more than one factor, including a discretionary component completely unrelated to any market rates or wholesale prices. The facts alleged in the Complaint are insufficient to give rise to any reasonable inference that Direct Energy did not do so. *See, e.g., Orange v. Starion Energy PA, Inc.*, 711 F. App'x 681, 683 (3d Cir. 2017) (fact that defendant charged higher rate than local

utility insufficient to state breach of contract claim where contract stated that the rate could be based on market conditions in several geographic areas and that "calculation of market conditions could account for" various factors "as determined in [defendant's] discretion"); *see also Hamlen v. Gateway Energy Servs. Corp.*, No. 16 CV 3526, 2017 WL 892399, at *4 (S.D.N.Y. Mar. 6, 2017) (allegation that defendant's rates "did not track wholesale or competitors' rates is not sufficient to allege breach of contract" where "contract expressly granted defendant discretion to set rates based on many other factors, and allegations regarding these factors [we]re not present in the complaint"). In fact, the Complaint entirely ignores the discretionary component of the rate calculation and what effect it may have (permissibly) had on the rates charged. Therefore, Sevugan fails to allege a breach of contract.

Sevugan cites to and attaches official transcripts from various cases he claims denied motions to dismiss in similar scenarios. (Dkt. Nos. 28-29). However, these cases are distinguishable because they are based on narrower contract language that does not include a discretionary component. *See, e.g., Yang Chen v. Hiko Energy*, LLC, No. 14 CV 1771 VB, 2014 WL 7389011, at *6 (S.D.N.Y. Dec. 29, 2014) (contract provided that rate would "reflect the wholesale cost . . . and other market-related factors" but did not provide for supplier discretion); *Melville v. Spark Energy, Inc.*, No. 15-8706, 2016 WL 6775635, at *3 (D.N.J. Nov. 15, 2016) (contract "specifically linked prices to market condition" and did not provide for supplier discretion). Therefore, *Orange*, *Hamlen* and other cases in which the contract permitted the supplier to base rates on multiple factors including its own discretion are more persuasive here.

The Court dismisses the breach of contract claim (Count II) without prejudice.

### III. Breach of Implied Covenant of Good Faith and Fair Dealing

"Under Illinois law, the covenant of good faith and fair dealing is not an independent source of duties for the parties to a contract." *Brooklyn Bagel Boys v. Earthgrains Refrigerated Dough Prods.*, 212 F.3d 373, 381 (7th Cir. 2000) (internal quotation marks omitted). An alleged violation of the implied covenant of good faith cannot form the basis for an independent tort action or even its own cause of action. *See Wilson v. Career Educ. Corp.*, 729 F.3d 665, 673–74 (7th Cir. 2013) (citing *Anderson v. Burton Assoc., Ltd.*, 578 N.E.2d 199, 203 (Ill. App. Ct.1991)). Because Illinois law does not recognize this cause of action, Sevugan's claim for breach of implied covenant of good faith and fair dealing (Count III) is dismissed with prejudice.

Additionally, Sevugan abandoned this claim by failing to provide any legal authority to substantiate it when responding to Direct Energy's Motion to Dismiss. *See Lekas*, 405 F.3d at 614 (dismissing claim as abandoned where plaintiff "did not present legal arguments or cite relevant authority to substantiate that claim in responding to defendants' motion to dismiss"); *Cincinnati Ins. Co. v. E. Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001) (failure to oppose an argument permits an inference of acquiescence and "acquiescence operates as a waiver"); *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1335 (7th Cir. 1994) ("[W]hen presented with a motion to dismiss, the non-moving party must proffer some legal basis to support his cause of action. The federal courts will not invent legal arguments for litigants.").

### IV. Unjust Enrichment

"In Illinois recovery for unjust enrichment is unavailable where the conduct at issue is the subject of an express contract between the plaintiff and defendant." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013) (citing *Guinn*, 836 N.E.2d at 704); *see also Nesby v. Country Mut. Ins. Co.*, 805 N.E.2d 241, 243 (Ill. App. Ct. 2004) ("Where there is a specific

contract that governs the relationship of the parties, the doctrine of unjust enrichment has no application."). While a party may plead unjust enrichment in the alternative, "the inconsistent-pleading option in this context is limited." *Id.* "A plaintiff may plead as follows: (1) there is an express contract, and the defendant is liable for breach of it; and (2) if there is not an express contract, then the defendant is liable for unjustly enriching himself at my expense." *Id.*

Sevugan fails to do so here. The unjust enrichment claim in the Complaint acknowledges that a contract exists, alleging that "Direct Energy has unjustly enriched itself and received a benefit beyond what was contemplated in the contract, at the expense of Plaintiff and the other members of the Class." (Dkt. No. 9 at ¶ 68). Accordingly, Sevugan's claim of unjust enrichment (Count IV) is dismissed without prejudice. *See Guinn*, 836 N.E.2d at 704 (plaintiff "may not include allegations of an express contract which governs the relationship of the parties, in the counts for unjust enrichment"); *see also, e.g., The Sharrow Grp. v. Zausa Dev. Corp.*, No. 04 C 6379, 2004 WL 2806193, at *3 (N.D. Ill. Dec. 6, 2004) (dismissing unjust enrichment claim where plaintiff re-alleged and therefore incorporated allegations regarding existence of contract into the count for unjust enrichment).

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss [21] is granted. Count III of the Complaint is dismissed with prejudice. Counts I, II and IV are dismissed without prejudice.

_____
Hon. Virginia M. Kendall
United States District Judge

Date: May 17, 2018

18