IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHETTY SEVUGAN, individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) No. 17 C 6569 ) |
| v. | ) Honorable Virginia M. Kendall ) |
| DIRECT ENERGY SERVICES, LLC, a Delaware corporation, | ) ) ) |
| Defendant. | ) ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Chetty Sevugan filed a class action suit against Defendant Direct Energy Services, LLC ("Direct Energy") alleging various state law claims against Direct Energy including claims for a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), breach of contract, breach of implied covenant of good faith and fair dealing, and unjust enrichment. (Dkt. 9). The Court granted Direct Energy's Motion to Dismiss the First Amended Complaint (*see* Dkt. 38) and Plaintiff filed a Second Amended Complaint, re-alleging only the breach of contract claim. (Dkt. 39). Direct Energy then moved to dismiss the Second Amended Complaint. (Dkt. 42). For the following reasons, the Motion to Dismiss is granted.

## BACKGROUND

The following facts are based on the allegations in the Complaint as well as the 2011 Electricity Supply Contract, 2011 Direct Energy Residential Uniform Disclosure Statement for Illinois, and 2012 renewal offer letter attached to the Complaint. (Dkts. 39-1, 39-2); *see also* Fed. R. Civ. P. 10(c). The court accepts all well-pleaded facts in the Complaint as true for purposes of the Motion to Dismiss and draws all inferences in favor of Plaintiff. *See Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010).

As with its prior Order on Defendant's first motion to dismiss, the Court also considers the complete version of the 2011 Direct Energy Supply Contract attached to Direct Energy's Motion to Dismiss because it is referred to in the Complaint and central to Plaintiff's claim. (Dkt. 42-1); *see also Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 718 (7th Cir. 2003) (considering contracts attached to motion to dismiss where they were referenced in the complaint and central to the breach of contact claim and the authenticity of the contracts was not in question). Plaintiff also attached the following four documents to his Response to the Motion to Dismiss: ComEd's 2018 Hourly Pricing Program Guide (Dkt. 46-1), a 2013 Electric Generation Service Agreement between Direct Energy and one of its municipal clients (Dkt. 46-2), the Direct Energy 2015 Risk Containment Checklist: Five Steps to Preparing for Volatile Energy Prices (Dkt. 46-3), and a ComEd Progress Report entitled "Company Information" based on information as of March 30, 2015 (Dkt. 46-4). Generally, matters outside the pleadings are not considered on a motion to dismiss. *See* Fed. R. Civ. P. 12(b)(6). However, a plaintiff opposing a Rule 12(b)(6) motion or appealing a dismissal "has much more flexibility" and "may elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (internal citations omitted). A party opposing a 12(b)(6) motion may also submit materials outside the pleadings "to illustrate the facts the party expects to be able to prove." *Id.* (internal citations omitted). The Court will consider the four exhibits attached to Plaintiff's Response because they are consistent with and elaborate on the pleadings and illustrate facts Plaintiff expects to be able to prove. Whether these materials are sufficient to support his claim is a separate issue addressed below.

The State of Illinois deregulated its market for retail electricity supply in 1997. (Dkt. 39 at ¶ 12). Prior to 1997, local utility companies were the sole suppliers and distributors of electricity

in the state. (*Id.*) The deregulation allowed privately-operated Alternative Retail Energy Suppliers (ARES) to supply energy to Illinois consumers without having to seek the Illinois Commerce Commission's (ICC) approval of their rates or the method by which they set their rates. (*Id.* at ¶¶ 13, 17). ARES do not produce or deliver energy. (*Id.* at ¶ 20). When a customer switches from a utility to an ARES, the ARES begins supplying that customer's energy. (*Id.* at ¶ 23). The customer's existing utility continues to deliver the energy supplied by the ARES and continues to bill the customer for both the supply and delivery costs. (*Id.*). However, for an ARES customer, the utility calculates the supply cost based on the kilowatt-hours (kWh) used multiplied by the rate charged by the ARES, not the regulated rate charged by the utility. (*Id.* at ¶ 24). Therefore, the only change the customer experiences is that the ARES, not the utility, sets the electricity supply price. (*Id.* at ¶ 23).

The ARES purchase energy directly or indirectly from energy producers who then deliver the energy to the utilities to deliver to ARES customers. (*Id.* at ¶¶ 18-19). Essentially, the ARES operate as brokers and traders of electricity, buying electricity at wholesale and reselling it to their customers at a markup. (*Id.* at ¶ 20). ARES have various options for purchasing the energy they resell to customers, including buying electricity production facilities, purchasing electricity from wholesale markets and brokers at a price at or near the time customers use it, and purchasing electricity in advance by purchasing futures contracts for electricity delivery at predetermined prices. (*Id.* at ¶ 21). The purpose of the 1997 deregulation was to allow ARES to use these and other innovative purchasing strategies to reduce electricity cost for Illinois customers. (*Id.* at ¶ 22).

According to the Complaint, the expectation that the competition spawned by ARES would help reduce wholesale purchasing costs and, in turn, lower retail residential rates has not occurred.

(*Id.* at ¶ 13). 98 ARES currently sell electricity in Illinois. (Dkt. 39 at ¶ 14; Dkt. 49-4). In April 2018, the Illinois Attorney General filed a lawsuit in state court against a different ARES. (*Id.* at ¶¶ 14-15, n.3). The lawsuit alleges that according to the ICC, from June 1, 2016 to May 31, 2017, ARES customers in the ComEd territory paid over $198 million for electricity than traditional utility customers in this territory. (*Id.*). The suit alleges also that in the past three years, residential and small-commercial ARES customers statewide have paid almost $400 million more for electricity than traditional utility customers. (*Id.*).[1] According the Complaint, of the 42 states that either began or considered this deregulation process, only 17 states and the District of Columbia remain deregulated or partially deregulated today. (*Id.* at ¶ 16).

In or around August 2011, Plaintiff switched electricity providers from ComEd to Defendant by enrolling in an Electricity Supply Contract (the "2011 Contract"). (*Id.* at ¶ 30; Dkt. 39-1). The 2011 Contract provided a fixed rate of $.0689 kWh for an Initial Term of twelve months and, once the Initial Term expired, automatically renewed on a month-to-month basis at a variable rate. (*Id.*). Specifically, the 2011 Contract provided in relevant part:

> **1. Terms of Service.** The essential terms of your electric generation service are as follows:
>
> **1. Terms of Service.** . . . **Initial Term.** "The Initial Term of your service is 12 monthly billing cycles. ("Initial Term").
>
> **Electric Generation Service Price per kWh *During* Initial Term.** During your Initial Term you will pay Direct Energy a fixed price of $.0689 per kWh. This price

---

[1] To support these allegations, Plaintiff cites a press release issued by the Illinois Attorney General discussing allegations made in a lawsuit filed by the Attorney General in Cook County Circuit Court against an ARES alleging the ARES used deceptive sales tactics to enroll customers into electricity supply contracts. (Dkt. 39 at ¶¶ 14-15, n.3). While the Court may consider facts within its judicial-notice power when deciding a motion to dismiss, *see Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012), it may only take judicial notice of facts "(1) not subject to reasonable dispute and (2) either generally known within the territorial jurisdiction or capable of accurate and ready determination through sources whose accuracy cannot be questioned." *Id.* at 773–74. Therefore, the Court takes judicial notice of the fact that the Illinois Attorney General asserted these factual allegations in a lawsuit but will not assume the truth of those allegations without more. *See, e.g., Matrix IV, Inc. v. Am. Nat. Bank & Tr. Co. of Chicago*, No. 06 C 1661, 2007 WL 853968, at *4 (N.D. Ill. Mar. 15, 2007).

4

includes your electric generation service and transmission charges, and *excludes* taxes and other utility fees and charges. . . .

**Electric Generation Service Price per kWh *After* Initial Term.** Your service will automatically continue on a month-to-month basis, and you will pay a variable price per kWh. This price may be higher or lower each monthly bill cycle. There is no early cancellation fee while taking service on a month-to-month basis. See Section 5 for details. . . .

**3. Pricing, Billing and Payment Terms.** During the Initial Term, you will pay Direct Energy for your electric generation service at the price set for the Initial Term, as set forth in Section 1 above. This price includes electric generation service and transmission charges and but excludes all other applicable taxes, and other utility fees and charges. Electric generation service prices of electric suppliers, such as Direct Energy, are set competitively and are not regulated by the Commission. . . .

**5. Renewal; Notice of a Change to this Agreement.** Upon completion of the Initial Term, this Agreement will automatically renew on a month-to-month basis at a variable price per kWh with no early cancellation fee. Direct Energy will charge you at a variable price per kWh based upon generally prevailing market prices for electricity in the PJM market at the Electric Utility load zone for the applicable period, plus an adder, determined solely by Direct Energy in its discretion. . . . You may obtain next month's variable price by calling Direct Energy using the contact information set forth in Section 15 below. Pricing is available on the 20th day (or following business day) of the previous month.

(Dkt. 39-1) (emphasis in original)). The "PJM market" refers to the PJM Interconnection, a regional transmission organization that coordinates the movement of wholesale electricity in all or parts of Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, and District of Columbia. (*Id.* at ¶ 4, n.1).

When the twelve-month, fixed-rate Initial Term concluded, Plaintiff called Defendant and renewed the contract for another year at a fixed rate. (*Id.* at ¶ 31). The renewed contract made the language in the 2011 Contract applicable to the second contract. (*Id.* at ¶¶ 31-34; Dkt. 39-2). When the twelve-month, fixed-rate Initial Term concluded on the second contract, Defendant

switched Plaintiff to a month-by-month contract at a variable rate. (*Id.* at ¶ 35). Plaintiff paid the variable rate from September 2013 through November 2016. (*Id.* at ¶ 51).

Plaintiff alleges that, contrary to the parties' contract, Defendant "did *not* base its [variable] kWh pricing upon generally prevailing market prices for electricity in the PJM market at the Electric Utility load zone for the applicable period plus a reasonable adder" and that Defendant's variable "kWh pricing was not competitive" because Defendant's variable kWh prices did not reflect the rates that ComEd offered. (*Id.* at ¶ 36).

Plaintiff alleges that ComEd prices accurately reflect generally prevailing market prices because ComEd "purchases electricity for its customers on the spot or daily market at the same market prices as other electricity retailers can, including Defendant." (*Id.* at ¶ 38). To support this allegation, Plaintiff points to ComEd's Hourly Pricing Program which, according to ComEd's 2018 Hourly Pricing Program Guide, is an energy supply option that ComEd offers to residential customers that allows customers to pay "hourly electricity prices based on the Residential ComEd Zone PJM wholesale market prices." (*Id.* at ¶ 37; Dkt. 46-1 at 4-5). Neither the 2018 Guide or the Complaint state how many of ComEd's residential customers have opted into the Hourly Pricing Program or whether the Program existed before 2018. Nonetheless, the Complaint asserts that the "[r]ates that ComEd and other local utilities charge reflect rates based on generally prevailing market prices." (Dkt. 39 at ¶ 39).

The Complaint provides the following chart and graph to demonstrate that Defendant's variable rates are "substantially higher" than ComEd's prices and are not priced at generally prevailing market prices in the PJM market:

| Billing Period | Direct Energy Per KWH | ComEd Per KWH | PJM Wholesale Market Price |
|---|---|---|---|
| Sep-13 | $0.064360 | $0.06044 | $0.045869 |
| Oct-13 | $0.079900 | $0.06005 | $0.044684 |

6

| | | | |
|---|---|---|---|
| Nov-13 | $0.079900 | $0.06005 | $0.043443 |
| Dec-13 | $0.079900 | $0.06005 | $0.047920 |
| Jan-14 | $0.086900 | $0.06023 | $0.104956 |
| Feb-14 | $0.089800 | $0.06023 | $0.083473 |
| Mar-14 | $0.095650 | $0.06023 | $0.070115 |
| Apr-14 | $0.094490 | $0.05965 | $0.053336 |
| May-14 | $0.093040 | $0.06023 | $0.056284 |
| Jun-14 | $0.096930 | $0.07096 | $0.049106 |
| Jul-14 | $0.119900 | $0.07096 | $0.045799 |
| Aug-14 | $0.119900 | $0.07096 | $0.046393 |
| Nov-14 | $0.123990 | $0.06930 | $0.047852 |
| Dec-14 | $0.124900 | $0.06930 | $0.043752 |
| Jan-15 | $0.124900 | $0.07072 | $0.048203 |
| Feb-15 | $0.120079 | $0.07072 | $0.069738 |
| Mar-15 | $0.109900 | $0.07072 | $0.051084 |
| Apr-15 | $0.108930 | $0.08072 | $0.041529 |
| May-15 | $0.105900 | $0.08072 | $0.042175 |
| Jun-15 | $0.112170 | $0.06975 | $0.040754 |
| Jul-15 | $0.109900 | $0.06647 | $0.049023 |
| Aug-15 | $0.110210 | $0.07180 | $0.045358 |
| Sep-15 | $0.113370 | $0.06582 | $0.046794 |
| Oct-15 | $0.115900 | $0.06721 | $0.042557 |
| Nov-15 | $0.115900 | $0.06792 | $0.042706 |
| Dec-15 | $0.116484 | $0.06506 | $0.038537 |
| Jan-16 | $0.118870 | $0.06487 | $0.044685 |
| Feb-16 | $0.115900 | $0.06512 | $0.042396 |
| Mar-16 | $0.115900 | $0.06630 | $0.041837 |
| Apr-16 | $0.115900 | $0.06546 | $0.043746 |
| May-16 | $0.116520 | $0.06798 | $0.040648 |
| Jun-16 | $0.118900 | $0.06197 | $0.045575 |
| Jul-16 | $0.118900 | $0.06459 | $0.055443 |
| Aug-16 | $0.118900 | $0.06261 | $0.054184 |
| Sep-16 | $0.118900 | $0.06280 | $0.052697 |
| Oct-16 | $0.118900 | $0.05888 | $0.053704 |



(*Id.* at ¶¶ 40, 42-43).

Plaintiff alleges that Defendant used its variable rate as a "profit center," increasing the rate when wholesale prices rose but keeping the rate "significantly higher" than the wholesale market rates when wholesale prices fell. (*Id.* at ¶ 44). Plaintiff alleges further than the "adder" identified in the contract cannot explain this "inflated variable rate" or "why Defendant's rates are disconnected from prevailing market prices and changes in wholesale costs" because the adder component is "fixed and does not fluctuate over time." (*Id.* at ¶ 45; *see also* Dkts. 46-2, 46-3). Therefore, according to Plaintiff, either Defendant did not base its variable rate on generally prevailing market prices in the PJM market, Defendant charged an unreasonable adder, or both. (Dkt. 39 at ¶¶ 46-48).

The Complaint also alleges that Defendant's prices are "substantially higher than . . . other ARES'[] prices" (*id.* at ¶ 40) but provides no chart, graph or other comparison of Defendant's prices to prices charged by any other ARES.

Plaintiff brings his breach of contract claim on behalf of himself and all Defendant's Illinois customers who paid Defendant a variable rate since September 12, 2007. (*Id.* at ¶ 49).

## LEGAL STANDARD

"To survive a motion to dismiss under 12(b)(6), a complaint must 'state a claim to relief that is plausible on its face.'" *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). "[I]t is not enough for a complaint to *avoid foreclosing* possible bases for relief; it must actually *suggest* that the plaintiff has a right to relief . . . by providing allegations that 'raise a right to relief above the speculative level.'" *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 777 (7th Cir. 2007) (citing *Twombly*, 550 U.S. at 555) (emphasis in original). The Court construes the complaint "in the light most favorable to the nonmoving party, accept[s] well-pleaded facts as true, and draw[s] all inferences in her favor." *Reynolds*, 623 F.3d at 1146. "[L]egal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 566 U.S. at 678).

## DISCUSSION

To state a breach of contract under Illinois law, Plaintiff must allege the following four elements: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the

plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)). The Court previously dismissed Plaintiff's breach of contract claim for failure to sufficiently allege the third element, finding Plaintiff failed to allege Direct Energy breached any term in the parties' contract. (Dkt. 38 at 14-16). Specifically, the Court found that the First Amended Complaint alleged only that Direct Energy breached the contract by charging variable rates that were not based on market-related factors, were not commensurate with rates otherwise available in the market or with changes in wholesale rates, or were higher than rates charged by ComEd but the contract itself did not require to Direct Energy to charge rates based on "market-related factors," tied only to rates otherwise available or to wholesale rates, or lower than those charged by ComEd. (*Id.* at 15). Rather, the parties' contract explicitly permitted Direct Energy to base its variable rate on *both* generally prevailing market prices *and* a discretionary adder determined solely by Direct Energy and the facts alleged in the Complaint failed to allege Direct Energy did not do so. (*Id.* at 15-16).

Plaintiff attempts to re-allege his breach of contract claim in the Second Amended Complaint, focusing on the following terms of the parties' contract:

> **3. Pricing, Billing and Payment Terms.** During the Initial Term, you will pay Direct Energy for your electric generation service at the price set for the Initial Term, as set forth in Section 1 above. This price includes electric generation service and transmission charges and but excludes all other applicable taxes, and other utility fees and charges. ***Electric generation service prices of electric suppliers, such as Direct Energy, are set competitively and are not regulated by the Commission.*** As to your billing and payment terms, your Electric Utility will send you a bill monthly which will set forth the total electric service charges for your electric service. That bill will contain, among other charges, Direct Energy's electric generation service price multiplied by the amount of electricity you used during the billing cycle, as measured and/or estimated by your Electric Utility. Your payment will be due to the Electric Utility by the date specified in the Electric Utility bill.

> **5. Renewal; Notice of a Change to this Agreement.** Upon completion of the Initial Term, this Agreement will automatically renew on a month-to-month basis at a variable price per kWh with no early cancellation fee. *Direct Energy will charge you at a variable price per kWh based upon generally prevailing market prices for electricity in the PJM market at the Electric Utility load zone for the applicable period, plus an adder, determined solely by Direct Energy in its discretion.* . . . You may obtain next month's variable price by calling Direct Energy using the contact information set forth in Section 15 below. Pricing is available on the 20th day (or following business day) of the previous month.

(Dkt. 39 at ¶¶ 4–5, 33–34 (citing Dkt 39-1 at ¶¶ 3, 5) (emphasis added)). Plaintiff now alleges that Direct Energy breached these provisions of the contract by "(1) "fail[ing] to base its prices upon generally prevailing market prices for electricity in the PJM market at the Electric Utility load zone for the applicable period, (b) fail[ing] to provide a competitive rate, (c) increas[ing] its adder to an unreasonable level, or (d) all the above." (*Id.* at ¶ 29). The Court addresses each of these allegations in turn.

### (a) Failure to charge "variable price per kWh based on generally prevailing market prices for electricity in the PJM market at the Electric Utility load zone for the applicable period"

Plaintiff alleges Defendant failed to base its prices on "generally prevailing market prices for electricity in the PJM market at the Electric Utility load zone" because Defendant's variable prices were higher than ComEd's and other utilities' and ARES' rates. (*Id.* at ¶¶ 36, 39-40). However, the Complaint provides no factual support for the assertion that Defendant's rates were higher than those charged by other utilities and ARES and the Court will not presume such conclusory allegations are true. *McCauley*, 671 F.3d at 616. The Court therefore looks only to the allegations comparing Defendant's rates to ComEd and wholesale market prices. But Plaintiff's assertion that ComEd and wholesale prices reflect "generally prevailing market prices" fails for several reasons.

As an initial matter, Plaintiff claim that ComEd's hourly rates offered through the Hourly Pricing Program reflect the wholesale market price for electricity is irrelevant, even if true.

11

Nothing in the Complaint indicates whether this Program was offered between September 2013 through November 2016 when Plaintiff was paying Defendant a variable rate or how many of ComEd's customers opted in to the program. More importantly, however, the Complaint does not allege what hourly rates the Program participants paid. The rates listed in the chart comparing Defendant's prices to the ComEd and wholesale market prices are the *fixed* rates ComEd charged customers who did not opt into any hourly rate program. Nothing in the Complaint suggests these *fixed* rates were also tied to the hourly market prices. In fact, a quick glance at the chart and graph suggests that ComEd fixed rates do not consistently track wholesale market prices. For example, the chart and graph show that PJM market prices declined between May 2014 and December 2014 but *neither* Defendant nor ComEd lowered its prices accordingly.

More importantly, however, Plaintiff's allegation that the electricity supply market in Illinois includes ComEd, other utilities *and* 98 ARES undermines his claim that ComEd alone is representative of "generally prevailing market prices" because it ignores the prices charged by these other market participants. "Generally prevailing market prices" necessarily includes prices charged by more than one market participant.

Plaintiff admits that he cites to ComEd prices "merely as an evidentiary representation of prices which *are* competitive and based upon the requisite PJM market price." (Dkt. 46 at 3 (emphasis in original)). But ComEd is not Defendant's only competitor. Defendant competes also with the other 97 ARES that also offer consumers an alternative to utility rates and arguably serve as Defendant's more direct competition. Additionally, the fact that ARES' methods of purchasing energy for resale differ from that of regulated utilities—*e.g.*, through purchasing electricity producers or purchasing futures (*see* Dkt. 39 at ¶ 21)—suggests that ARES' and utilities' prices should differ. For example, whereas utilities rely on spot or daily market prices (*see* Dkt. 39 at ¶

12

38), ARES can hedge their purchases to avoid volatility in those markets. Finally, the fact that ComEd is the "Largest Utility in Illinois"[2] does not automatically make it a "reasonable comparator" as Plaintiff claims (*see* Dkt 49 at 14) but rather provides further reason to believe ComEd's prices are *not* representative of other, smaller electricity suppliers like Defendant and other ARES and, therefore, not representative of the market as a whole. Therefore, the Court cannot reasonably infer that ComEd's prices alone accurately reflect the "generally prevailing market prices" in an electricity supply market that according to Plaintiff consists of over 100 competitors.

Ultimately, Plaintiff's claim that Defendant failed to base its rate on "generally prevailing market prices" boils down to a claim that Defendant failed to charge rates commensurate with ComEd's rates or with wholesale market prices. This claim fails to allege a breach because the parties' contract does not require Defendant to charge such rates. In fact, as the Court explained in its prior order, the parties' contract allowed Defendant to base its rate on more than one factor, including a discretionary component completely unrelated to ComEd, market or wholesale rates. (Dkt. 38 at 15). Therefore, even if Defendant's rates as a whole did *not* reflect generally prevailing market prices, that alone would be insufficient to allege a plausible breach of the contract because it fails to address the discretionary component of the variable pricing. (*See* Dkt. 38 at 15-16 (citing *Orange v. Starion Energy PA, Inc.*, 711 F. App'x 681, 683 (3d Cir. 2017) and *Hamlen v. Gateway Energy Servs. Corp.*, No. 16 CV 3526, 2017 WL 892399, at *4 (S.D.N.Y. Mar. 6, 2017)).

---

[2] According to materials published by ComEd, as of 2015 ComEd was the "Largest Electric Utility in Illinois" and "provide[d] service to more than 4 million customers across Southern Illinois, or 70 percent of the state's population." (Dkt. 46-4).

### (b) Failure to charge an "adder, determined solely by Direct Energy in its discretion" that is reasonable

Plaintiff attempts to cure the deficiency in his previous complaint and addressing the discretionary component of Defendant's variable price by this time alleging that the discretionary adder charged by Defendant was "unreasonable." Specifically, Plaintiff argues that "Illinois law requires that the adder be construed in accordance with the ordinary expectations of reasonable people." (Dkt. 39 at ¶ 61). Plaintiff cites several cases standing for the general contract interpretation principle that where a contract is silent as to a price term or where the price term is indefinite, the law implies that the price must be "reasonable." (*See* Dkt. 39 at ¶47, n.8; Dkt. 49 at 11-12 (listing cases)).[3] Plaintiff is correct that under Illinois law, where a contract for goods or services is silent as to price, the law implies that that the price must be a "reasonable" one. *See Protestant Hosp. Builders Club, Inc. v. Goedde*, 424 N.E.2d 1302, 1305 (1981) (In Illinois in situations where there is a contract, express or implied, under which one party supplies articles or services to another and there is no provision setting out the amount the supplier is to be compensated, the law implies that there is an agreement to pay a reasonable price for the goods and services.") Here, the parties' contract is not silent as to the amount of the adder to be charged. Rather, despite Plaintiff's claim that the adder is "undescribed and unquantified" (*see* Dkt. 39 at ¶¶ 6, 27), the contract explicitly provides that the adder is "to be determined solely by Direct Energy in its

---

[3] Citing *In re Marriage of Schmidt*, 684 N.E.2d 1355, 1361 (Ill. App. Ct. 1997) ("Although the agreement itself could have used the term 'reasonable,' . . . we find it is an implied term under contract law where a contract is silent as to price or another, more specific method of determining price."); *Ingrassia v. Ingrassia*, 509 N.E.2d 729, 737 (Ill. App. Ct. 1987) ("When parties to a contract have been silent as to a price term, it will be implied that they intended a reasonable price. The term missing from the settlement agreement's college education provision is essentially a price term, so a reasonable price is implied.") (internal citations omitted); *Victory Mem. Hosp. v. Rice*, 624, 493 N.E.2d 117, 119 (Ill. App. Ct. 1986) (service contract that is indefinite with respect to price requires proof of the reasonableness of the amount charged); *Bank of Am., N.A. v. R. B. Gustafson Co.*, No. 10 CV 1608, 2012 WL 3134003, at *8 (N.D. Ill. July 31, 2012) ("When an agreement for the sale of goods is silent on an issue, courts imply reasonable contract terms as set forth in the UCC. However, the gap-filling provisions of the UCC operate only to the extent the parties' agreement is silent on the issue.").

discretion." (Dkt. 39-1 at ¶ 5). However, Illinois courts have interpreted similar terms to be sufficiently indefinite to require that the court impose a "reasonableness" requirement. *See, e.g., Victory Mem. Hosp.*, 493 N.E.2d at 119 (finding that service contract in which patient agreed to pay "hospital's regular charges" was sufficiently "indefinite with respect to price so as to require proof of the reasonableness of plaintiff's charges"); *Protestant Hosp. Builders Club, Inc.*, 424 N.E.2d at 1306 (contract term that "vests in plaintiff unrestricted discretion in determining what price to charge for its materials and services" and "offers no formula for computing prices other than the discretion of the supplier" is indefinite and requires supplier to show charges were reasonable).[4]

However, even if Defendant is required to charge a "reasonable" adder, the Complaint fails to allege that it did not do so. Plaintiff alleges only that the adder "reflects all [of Defendant's] non-energy costs to provide service to its customers" (*id* at ¶ 27) and that "[t]hese non-energy costs are insignificant in terms of the overall costs that Defendant incurs to provide retail electricity" (*id.*), so "[t]o the extent Defendant *did* charge Plaintiff based upon generally prevailing market prices," Defendant's "excessive prices"—*i.e.*, prices higher than ComEd and wholesale prices—"could only have resulted from charging an unreasonable adder." (*Id.* at ¶¶ 45-47). This entire theory is based on Plaintiff's assertion that the adder is based only on Defendant's non-energy costs and is fixed and does not fluctuate over time.

---

[4] Plaintiff also argues that while the implied covenant of good faith and fair dealing does not form the basis for an independent action, it applies to all written contracts and requires that where a contract vests a party with discretion in exercising its obligations under the contract, the party must do so reasonably. (*See* Dkt. 46 at 5-6, n.1 (citing *First Nat. Bank of Cicero v. Sylvester*, 554 N.E.2d 1063, 1069 (Ill. App. Ct. 1990)) ("Every contract implies good faith and fair dealing between the parties. Good faith between the contracting parties requires the party vested with contractual discretion to exercise it reasonably, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.") (internal citations omitted)). Because the Court finds that the adder must be "reasonable" based on the indefiniteness of the term as written in the contract, it need not address whether the covenant of good faith and fair dealing applies here or, if so, what Defendant's obligations are under the covenant.

But the only support Defendant offers for this claim that the adder is fixed are two documents attached as exhibits to its Response: (1) a 2013 contract between Defendant and a municipal client that provides for an "Index Price" composed of a "Fixed Adder and the Index Energy Charge" where the "Fixed Adder" is defined as meaning "a fixed per kWh charge assessed on each kWh delivered . . . which shall reflect all non-energy costs to provide Electric Generation Service" (Dkt. 39-2) and (2) a 2015 Risk Containment Checklist issued by Defendant and aimed at business customers which makes references to a "fixed adder," for example, in discussing costs "wrapped into a . . . fixed adder." (Dkt. 39-3). The municipal contract is clearly distinguishable from the parties' contract as it explicitly provides for a "Fixed Adder" as opposed to a discretionary adder. More generally, however, Plaintiff's claim involves a residential-customer contract, not a municipal-client or business-client contract. The "fixed adder" language in the 2013 municipal-client contract and 2015 Checklist for business clients appears nowhere in the parties' contract and Plaintiff provides no grounds for inferring that this language is incorporated into or even relevant to Defendant's residential-client contracts. Moreover, Plaintiff's contract states that the adder is "discretionary" and, therefore, necessarily *not* fixed.

The Court cannot infer from the facts alleged that the adder is based only on Defendants' non-energy related costs or that the adder is fixed. The contract grants Defendant's broader discretion than Plaintiff describes. Plaintiff's Complaint fails to allege how Defendant exercised its discretion in determining the adder unreasonably, except to claim that the final variable prices were greater than ComEd and wholesale prices. Plaintiff's assertion that this price difference is attributable to the discretionary adder is entirely speculative, as he admits. (*See* Dkt. 39 at "Defendant's excessive pricing *could have resulted* from its failure price based upon generally prevailing market prices . . . *and* including an unreasonable adder. . . . [D]iscovery is required to

determine which impropriety Defendant committed." (emphasis added)). But even if it were attributable to the adder, Plaintiff again has failed to allege that Defendant's rates are not reasonable in comparison to *all* of its competitors' rates. (*C.f.* Dkt. 46 at 12-13 (citing *Hamlen*, 2017 WL 892399, at *5 (plaintiff sufficiently alleged that supplier charged unreasonable rates where customers "reasonably expected to pay defendant competitive prices for natural gas" and "rates were substantially higher than its competitors' rates"))).

### (c) Failure to charge "[e]lectric generation service prices . . . set competitively"

Plaintiff's allegation that Defendant failed to set its prices competitively fails for the same reasons as its claim regarding "generally prevailing market prices" fails. The Complaint focuses only on one competitor in the electricity supply market and ignores the majority and arguably more relevant market participants that together determine "competitive" market prices. Additionally, it is not clear what "competitively" as used in the contract means. Paragraph three of the contract states:

> During the Initial Term, you will pay Direct Energy for your electric generation service at the prices set for Initial Term, as set forth in Section 1 above. This price includes electric generation service and transmission charges . . . Electric general service prices of electric suppliers, such as Direct Energy *are set competitively and are not regulated by the Commission*.

(Dkt. 39-1 at ¶ 3 (emphasis in original)). When read in context, the most reasonable interpretation is that "competitively" describes the method in which the prices are set, *i.e.*, independently by privately-operated providers, and not the actual price itself. The Court notes also that the "Pricing, Billing and Payment Terms" set forth in paragraph 3, as cited above, refer only to the fixed rate applicable during the twelve-month Initial Term and it is at least not clear whether they also apply to month-to-month variable rate charged thereafter and addressed later in the contract at paragraph five. Regardless, the reasons already set forth by the Court in section (a) above are sufficient to

17

find that the Complaint fails to allege Defendant breached any obligation to set prices "competitively."

## **CONCLUSION**

For the reasons stated above, Defendants' Motion to Dismiss (Dkt. 42) is granted. Plaintiff's Second Amended Complaint is dismissed with prejudice.

											_____
											Hon. Virginia M. Kendall
											United States District Judge

Date: August 29, 2018